**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF NEW YORK**

_____

In Re:                                          Chapter 11

TONAWANDA COKE CORPORATION,                     Case No. 18-12156

                              Debtor.           Hon. Carl L. Bucki, U.S.B.J.

_____


**DISCLOSURE STATEMENT FOR THIRD AMENDED PLAN OF LIQUIDATION
OF TONAWANDA COKE CORPORATION**

**Table of Contents**

INTRODUCTION ........................................................................................................... 7

SUMMARY OF VOTING PROCEDURES ..................................................................... 8

ARTICLE I.     OVERVIEW OF THE PLAN ................................................................. 8

A.   Summary of Plan Structure. ..................................................................................... 8

B.   Summary of Proposed Distributions. ........................................................................ 8

ARTICLE II.     BACKGROUND LEADING TO CHAPTER 11 FILING ................................... 9

A.   Civil Lawsuits. ......................................................................................................... 9

B.   Consent Decree. ...................................................................................................... 11

C.   Criminal Judgment. ................................................................................................. 12

D.   Financial Status on Petition Date. ........................................................................... 13

ARTICLE III.     EVENTS DURING THE CHAPTER 11 CASE ................................... 14

A.   Retention of Debtor's Professionals. ....................................................................... 14

B.   Filing of the Schedules and Statement of Financial Affairs. .................................. 15

C.   Appointment of Creditors' Committee. ................................................................... 15

D.   Asset Sales. ............................................................................................................. 15

E.   Recovery of Assets from Debtor's Affiliates .......................................................... 16

F.   Settlement of Claims Against Powres Coal and Coke. ........................................... 16

G.   Settlement of EPA and New York Department of Labor Claims. ........................... 17

H.   Motion to Compel Turnover of Property from Affinity Insurance Ltd.. .................. 19

I.   The Proof of Claims Bar Date.. ............................................................................... 20

J.   Administrative Claims Bar Date .............................................................................. 20

K.   Post-Petition Opertions ........................................................................................... 20

L.   Funding For Chapter 11 Plan ................................................................................... 20

ARTICLE IV.     DESCRIPTION OF THE PLAN ........................................................ 20

A.   Overview. ................................................................................................................ 20

B.   Administrative Expense and Priority Tax Claims; Administrative Claim Bar Date. ........... 21

C.   Classification and Treatment of Claims and Interests. ............................................ 21

   1.   Classification and Treatment of Classified Claims ............................................ 21

   2.   Claims May Be in More Than One Class. .......................................................... 23

   3.   Impairment, Classification, and Related Disputes. ............................................. 23

D.   Acceptance or Rejection of the Plan. ....................................................................... 23

   1.   Classes and Claims Entitled to Vote. ................................................................. 23

   2.   Acceptance by a Class of Claims. ...................................................................... 24

3. Cramdown. ...................................................................................................................... 24

E. Effects of Confirmation. ................................................................................................... 24

1. Revesting of Assets. ........................................................................................................ 24

2. Preservation and Retention of Defenses of the Debtor and Rights to Object to Claims and Interests. ........................................................................................................................... 24

3. Authority to Effectuate the Plan. .................................................................................... 24

4. No Waiver of Legal Privileges. ...................................................................................... 24

F. Means of Implementation of the Plan. .............................................................................. 24

1. Continued Existence of the Debtor. ................................................................................ 24

2. Entity Governance Documentation. ................................................................................ 25

3. The Plan Administrator. .................................................................................................. 25

   a. Appointment. ................................................................................................................ 25

   b. Rights, Powers, and Duties of the Debtor and the Plan Administrator. ..................... 25

   c. Compensation of the Plan Administrator. ................................................................... 25

   d. Limitations on Liability. .............................................................................................. 26

   e. Retention of Professionals. .......................................................................................... 26

G. Provisions for the Resolution of Claims Against the Debtor and Disposition of Assets...... 26

1. Objection to and Resolution of Claims Against the Debtor. ........................................... 26

   a. Authority to Object to and Resolve Objections to Claims. ......................................... 26

   b. Limitations on Filing Objections to Claims and Interests. ......................................... 26

   c. Deadline for objection to Claims and Interests. ......................................................... 26

   d. Compromise of Disputed Claims. ............................................................................... 26

   e. Estimation of Claims. .................................................................................................. 27

2. Liquidation of Assets. ..................................................................................................... 27

   a. Plan Administrator May Sell or Dispose of Estate Assets. ........................................ 27

H. Distributions........................................................................................................................ 27

1. Distributions on Account of Allowed Administrative Claims. ....................................... 27

2. Distributions on Account of Allowed Priority Tax Claims............................................. 27

3. Distributions on Account of Classified Claims............................................................... 27

   a. Claims Allowed Prior to the Initial Distribution Date................................................ 28

   b. Claims Allowed on or After the Initial Distribution Date. ......................................... 28

4. Distributions Paid to Holders of Record. ....................................................................... 28

5. No Distributions on account of Disputed or Disallowed Claims. ................................... 28

6. Setoff. .............................................................................................................................. 28

7. The Disputed Claims and Interests Reserve.................................................................... 29

3

8. The Expense Reserve. .................................................................................. 29

9. Maintenance of the Disputed Claims Reserve, the Expense Reserve, and other Cash of the Debtor and the Estate. ................................................................... 30

10. Finality of Distributions. ......................................................................... 30

11. Manner of Payment; delivery of Distributions. .......................................... 30

12. Fractional Amounts. ................................................................................. 30

13. Minimum Cash Distributions. .................................................................. 30

14. Compliance with Tax Requirements/Allocations. ...................................... 30

I.  Satisfaction of Claims, Injunctions, and Limitations of Liability. .................. 31

1. No Discharge of Claims Against Debtor. .................................................. 31

2. Injunction; Limitation on Liabilities;. ....................................................... 31

3. No Liability for Solicitation or Participation. ............................................ 32

4. Terms of Injunctions and Stays. ............................................................... 32

5. Release of Liens. ..................................................................................... 32

6. Cancellation of Instruments. .................................................................... 32

J.  Other Plan Matters. ...................................................................................... 32

1. Executory Contracts and Unexpired Leases. ............................................. 32

   a. Assumption of Executory Contracts and Unexpired Leases. .................. 32

   b. Claims for Rejection Damages. ............................................................ 33

   c. Objections to Proofs of Claim Based On Rejection Damages. ................ 33

2. Conditions Precedent to the Effective Date. .............................................. 33

3. Retention of Jurisdiction. ........................................................................ 33

4. Modification of the Plan. ......................................................................... 35

5. Revocation or Withdrawal of the Plan. ..................................................... 35

K. Miscellaneous Provisions. ............................................................................ 36

1. Exemption from Transfer Taxes. .............................................................. 36

2. Closing of the Bankruptcy Case. ............................................................. 36

3. No Admissions. ....................................................................................... 36

4. Controlling Documents. ........................................................................... 36

5. Governing Law. ....................................................................................... 36

6. Successors and Assigns. .......................................................................... 36

7. Severability. ............................................................................................ 36

8. Integration. ............................................................................................. 37

9. Binding Effect. ........................................................................................ 37

10. Other Documents and Actions. ................................................................ 37

ARTICLE V.      FINANCIAL INFORMATION......................................................... 37

ARTICLE VI.    ALTERNATIVES TO CONFIRMATION AND CONSUMMATION
                       OF THE PLAN............................................................................. 37

ARTICLE VII.   CERTAIN FEDERAL INCOME TAX CONSEQUENCES
                       OF THE PLAN............................................................................. 38

ARTICLE VIII.   CONCLUSION AND RECOMMENDATION ............................ 38

EXHIBITS

Exhibit A       Plan
Exhibit B       Sources and Uses Of Cash
Exhibit C       Liquidation Analysis

**This Disclosure Statement describes a Third Amended Plan of Liquidation (the "Plan") for Tonawanda Coke Corporation (the "Debtor"). Capitalized terms not defined herein shall have the meanings ascribed to them in the Plan. The Debtor will ask the Bankruptcy Court to confirm the Plan. Confirmation is subject to certain material conditions and there is no assurance that those conditions will be satisfied.**

**If the Bankruptcy Court confirms the Plan, the Debtor intends to have the Plan become effective as promptly as possible thereafter and to make the first distribution called for under the Plan to all holders of Allowed Claims.**

**The Debtor requests that each eligible creditor vote in favor of the Plan. As described further below, the Debtor believes that confirmation of the Plan represents the best mechanism available to provide a distribution to creditors in general, but in particular to holders of Allowed general unsecured claims.**

**To have your vote counted, you must return an executed Ballot to the United States Bankruptcy Court for the Western District of New York on or before 10:00 a.m. prevailing Eastern time on [_____, 202--] (the "Voting Deadline"). You may send your Ballot via first class mail, via overnight mail or hand delivery to the following address: United States Bankruptcy Court for the Western District of New York (Attn: Court Clerk), 2 Niagara Square, Buffalo, NY 14202.**

**To be counted, your Ballot must be duly completed, executed, and actually <u>received</u> no later than the Voting Deadline.**

**This Disclosure Statement summarizes events that occurred prior to the Debtor's filing for bankruptcy, material events in the bankruptcy case, and the Plan itself. You should read this Disclosure Statement and the Plan in their entirety. The Debtor believes that the information set forth in these documents is fair and accurate; however, the Plan and this**

Disclosure Statement (and the summaries that they provide) are qualified in their entirety by the matters to which they refer. Factual information contained in the Disclosure Statement is based on Debtor's books and records, as well as public information related to the proceedings described in the Disclosure Statement. The Debtor does not represent or warrant that the information contained in this Disclosure Statement, including the financial information, is without any inaccuracy or omission.

As you determine whether to vote to accept the Plan, you must rely on your own examination of the Debtor and the terms of the Plan, including the merits and risks involved. The contents of this Disclosure Statement do not provide any legal, business, financial, or tax advice. You should consider consulting with your own legal, business, financial, and tax advisors with respect to the Plan and the Disclosure Statement.

Except as set forth in this Disclosure Statement, no person is authorized by the Debtor to give any information or to make any representation related to the Plan other than as contained in this Disclosure Statement. You should not rely on any such representation you may receive as having been authorized by the Debtor. The Disclosure Statement does not constitute an offer to buy or the solicitation of an offer to buy any securities, or an offer to sell or a solicitation of an offer to sell any securities.

The statements contained in this Disclosure Statement are made as of the date hereof (unless otherwise indicated) and should not under any circumstance create any implication that the information contained herein is correct at any time subsequent to the date hereof. Estimates of Claims set forth in this Disclosure Statement may vary from the amounts of Claims ultimately allowed by the Bankruptcy Court.

The information contained in this Disclosure Statement is included for purposes of soliciting votes on the Plan only and should not be deemed as an admission or stipulation of any kind, absent the Debtor's express, written consent.

# INTRODUCTION

Tonawanda Coke Corporation ("TCC" or the "Debtor") provides this disclosure statement (the "<u>Disclosure Statement</u>") in connection with the Third Amended Plan of Liquidation (the "<u>Plan</u>") it has proposed. TCC is soliciting votes on the Plan. A copy of the Plan is attached to this Disclosure Statement as <u>Exhibit "A"</u>. Capitalized terms not defined in this Disclosure Statement are defined in the Plan or the Bankruptcy Code.

This Disclosure Statement summarizes certain information regarding TCC's operations prior to filing for bankruptcy and significant events that have occurred during the bankruptcy case. This Disclosure Statement also describes the Plan, estimated recoveries under the Plan, the effect of confirmation of the Plan, the manner in which distributions will be made under the Plan, and summarizes the process to confirm the Plan, including voting on the Plan. While TCC has attempted to provide a fair and accurate summary of the matters described in this Disclosure Statement, the summary of information contained in this Disclosure Statement is not binding upon TCC.

On [_____, 202__], the Bankruptcy Court entered an order finding that this Disclosure Statement contains "adequate information" within the meaning of section 1125 of the Bankruptcy Code. "Adequate information" is "information of a kind, and in sufficient detail ... that would enable ... a hypothetical investor ... to make an informed judgment about the plan." The Bankruptcy Court has authorized TCC to use this Disclosure Statement to solicit votes on the Plan. **Even though the Bankruptcy Court has approved this Disclosure Statement and authorized TCC to use this Disclosure Statement to solicit votes on the Plan, the Bankruptcy Court has not yet determined whether the Plan should be confirmed.**

The Bankruptcy Court has authorized **<u>only</u>** this Disclosure Statement [**and the attached letter from the Official Committee of Unsecured Creditors (the "Committee Letter")**] to be used in connection with solicitation of votes on the Plan. In voting to accept or reject the Plan, you should rely only on information contained in this Disclosure Statement (and accompanying exhibits) **and the enclosed Committee Letter** and should not rely on information from other sources.

**TCC recommends that creditors entitled to vote on the Plan vote to accept the Plan.**

# SUMMARY OF VOTING PROCEDURES

Together with this Disclosure Statement and the accompanying exhibits, you should receive a Ballot to vote on the Plan. After reviewing this Disclosure Statement and the accompanying exhibits, if you are entitled to vote on the Plan, you should vote to accept or reject the Plan using the enclosed Ballot and return it by overnight courier, regular mail or hand delivery to TCC's attorneys at the address specified on the Ballot. Additionally, if you are entitled to vote, you should also confirm whether the claim amount specified on the ballot is correct (and, if you believe it is incorrect, indicate the ***amount of the claim*** you assert you hold against TCC on the Ballot). **Only holders of Claims in Classes 2 and 3 may vote on the Plan. Creditors in Class 1 are unimpaired and are deemed to accept the Plan. If you are entitled to vote on the Plan, you must return your Ballot by overnight courier, regular mail or hand delivery. Ballots submitted by facsimile or other electronic transmission will not be accepted and will be void.**

**The deadline to vote on the Plan is [_____] at 10:00 a.m. prevailing Eastern time (the "Voting Deadline"). Your Ballot must be *received* on or before the Voting Deadline for your vote on the Plan to be counted.** If you have not received a Ballot, or if your Ballot is lost or mutilated, you may obtain a replacement Ballot by contacting TCC's attorneys at the address set forth at the end of this Disclosure Statement.

# ARTICLE I. OVERVIEW OF THE PLAN

The following is a brief overview of the material provisions of the Plan and is qualified in its entirety by the full text of the Plan, which is attached as Exhibit A. For a more detailed description of the terms of the Plan, see Article IV, entitled "The Plan of Reorganization."

## A.    Summary of Plan Structure.

The Plan is a plan of liquidation. Funds distributed under the Plan will consist of funds accumulated by TCC as of the Effective Date and distributions from the Debtor's captive insurance carrier Affinity Insurance Ltd. Distribution of the Debtor's assets pursuant to the Plan are contingent on confirmation of the Plan and the affirmative vote of one-impaired class of claimants. The Plan provides exculpation for TCC and other parties, including Michael Durkin and Paul Saffrin, for actions taken during the course of the bankruptcy case, and limits the liability of TCC related parties and the Plan Administrator for actions taken in carrying out the Plan.

## B.    Summary of Proposed Distributions.

All Allowed Administrative Claims, including the EPA Supplemental Administrative Claim and the DOL Supplemental Administrative Claim shall be paid in full.

The EPA Supplemental Administrative Claim equals 83.7% of the amount remaining in the Debtor's Estate after payment of: (i) all Allowed Administrative Claims, including Professional Fees, other than said EPA Supplemental Administrative Claim and the DOL Supplemental Administrative Claim, and (ii) the General Unsecured Claim Initial Carveout.

The DOL Supplemental Administrative Claim equals 6.3% of the amount remaining in the Debtor's Estate after payment of: (i) all Allowed Administrative Claims, including Professional Fees, other than said DOL Supplemental Administrative Claim and the EPA Supplemental Administrative Claims, and (iii) the General Unsecured Claim Initial Carveout.

All creditors holding Allowed Priority Claims will be paid in full under the Plan. TCC is aware of approximately $5,156.86 in Allowed Priority Claims.

TCC does not believe there are any secured claims to be paid under the Plan.

General Unsecured Claims and Tort Claims shall each receive pro rata distributions from the General Unsecured Claim Initial Carveout of $200,000.00 and the General Unsecured Claim Supplemental Carveout (10% of the of the amount remaining in the Debtor's Estate after payment of: (i) all Allowed Administrative Claims, including Professional Fees, other than DOL Supplemental Administrative Claim and the EPA Supplemental Administrative Claims, and (iii) the General Unsecured Claim Initial Carveout). The Debtor estimates the General Unsecured Claim supplemental Carveout to be less than $100,000.00

## ARTICLE II. BACKGROUND LEADING TO CHAPTER 11 FILING

The Debtor formerly produced high-performance foundry coke. Foundry coke is a pure carbon product that is placed in cupolas to provide both a heat source and a hardening source in the production of cast iron metal. The Debtor served customers in a variety of industries including automotive, pipe manufacturing, agricultural refining, and municipal castings.

The Debtor's coke facility was situated on approximately 188 acres along the Niagara River, about a mile north of Buffalo, New York. The facility included four parcels of land located on opposite sides of River Road in Tonawanda, New York: 3875 River Road and 3800 River Road (collectively, the "Site"). The Debtor began operations at the Site in February of 1978 after it was purchased from Allied Chemical Corporation ("Allied Chemical"), pursuant to an asset purchase agreement dated January 27, 1978. In 1999, Allied Chemical merged with Honeywell International Inc. (now known as Honeywell, Inc.) ("Honeywell"). The Debtor believes that Allied Chemical operated the Site from 1917 to January of 1978. As is customary in the industry, the Debtor operated the Site 24 hours per day, 365 days a year. Historically, the Debtor employed approximately 100 people at the Site. At the time of the bankruptcy filing, approximately 30 employees remained on the payroll.

The Debtor had been historically capitalized through the profits derived from the day to day operations of its business, as it has not had a traditional line of credit since at least 2010 due to the stigma of its criminal judgment described below.

## A.     Civil Lawsuits:

The Debtor is one of three defendants in twenty pending civil litigation matters (the "Civil Lawsuits") in Erie County Supreme Court (the "Erie Court"). The Abbott case (Index No. 2011-2327) is a mass tort action containing approximately 307 plaintiffs. The DeLuca case (Index No. 2010-10280) is a class action with as many as 39,000 potential members in the class. All of the

Civil Lawsuits are being presided over by the Honorable Paula L. Feroleto, J.S.C. Other than the Abbott and DeLuca cases, the Debtor believes each of the other Civil Lawsuits involve individual families and have between one and five plaintiffs. None of the plaintiffs in the Civil Lawsuits have moved to lift the automatic stay or taken any steps to further litigate their claims following the Petition Date.

The Civil Lawsuits have been consolidated for case management purposes and each of the Civil Lawsuits alleges that the Debtor wrongfully released pollutants into the air, ground, and water resulting in property damage, personal injury, fear of developing cancer, a need for medical monitoring, and a general loss of quality of life. Following successful motions to dismiss, the following causes of action remain: negligence, gross negligence, strict liability, battery, trespass, and nuisance. With regard to the DeLuca case, the Erie Court has certified classes for property loss and loss of quality of life.

The Civil Lawsuits have been incredibly document intensive, and were near the close of written discovery as of the Petition Date.

There is no insurance coverage for any of the Civil Lawsuits. All attorneys' fees are solely the responsibility of the Debtor, as would be any and all potential damages. As there is no insurance coverage, the Debtor has expended a significant amount of money to defend the Civil Lawsuits, and would need to do so on a going forward basis for the foreseeable future if the suits proceeded.

The lawsuits pending against Tonawanda Coke, the estate of J.D. Crane, and/or the Debtor's former environmental manager, Mr. Kamholz are:

- DeLuca, Index No. 805565/2016

- Guggemos, Index No. 010578/2010

- Brigante, Index No. 010579/2010

- Nuchereno, Index No. 010580/2010

- Vanlear, Index No. 010694/2010

- Barr, Index No. 010695/2010

- Axelson, Index No. 011102/2010

- Darin, Index No. 011319/2010

- Westphal, Index No. 011360/2010

- Cameron, Index No. 011746/2010

- Coffey, Index No. 000718/2011

- Ratajczak, Index No. 001806/2011

- Drapo, Index No. 001849/2011

- Snyder, Index No. 004575/2011

- Brown, Index No. 004576/2011

- Carbone, Index No. 004708/2011

- Cuzydlo, Index No. 804662/2014

- Merckel, Index No. 809211/2015

Another lawsuit is pending against only the Debtor and the estate of J.D. Crane: Robins v. Tonawanda Coke, et al. (Index No. 2011-606025). All of the foregoing tort actions arise out of the alleged activities of the Debtor, Mr. Crane, and/or Mr. Kamholz in the operation of the Debtor's business.

There is also an asbestos related action in which Tonawanda Coke is one of many defendants. That action is Armstrong v. Tonawanda Coke, et al. (Index No. 2017-810477).

**B.**    **Consent Decree:**

On April 10, 2015, the Debtor agreed to the terms and conditions of a consent decree (the "Consent Decree") with the New York State Department of Environmental Conservation ("DEC"), the New York State Attorney General's Office ("NYS AG"), United States Department of Environmental Protection Agency ("EPA"), and the United States Department of Justice – Environmental Enforcement Section ("US DOJ," and collectively with NYSDEC, USEPA, and NYS AG, the "Agencies") on a global resolution of certain civil and administrative allegations and claims pending against it under the Clean Air Act, Clean Water Act, the Emergency Planning and Community Right to Know Act of 1986, Article 19 of the New York State Environmental Conservation Law, and certain facility operating permits. The Consent Decree and an associated complaint was filed with the United States District Court for the Western District of New York on May 11, 2015 in the case of *United States and Debtor in United States et al. v. Tonawanda Coke Corp.* (W.D.N.Y.) (Case 1:15-cv-00420). The Consent Decree became effective as of October 28, 2015.

As part of the Consent Decree's terms, the Debtor committed to the following: undertaking certain capital projects, process upgrades, and third-party assessments of its operations and compliance with environmental laws; payment of civil penalties in the amount of $2,750,000 to the United States ($1,750,000) and New York State ($1,000,000); payment of $1,000,000 to New York State to be used for an Environmental Benefit Project; and, the funding of a Supplemental Environmental Project ("SEP") in an amount not less than $357,143. The process for addressing the capital projects, process upgrades, and related obligations have involved significant financial expenditures to outside counsel, environmental professionals, and third-party consultants and contractors. A great deal of internal time and resources had also been expended on oversight and compliance with these requirements.

The various injunctive relief obligations under the Consent Decree have specifically enumerated time periods by which they are to be addressed and/or submissions are to be made to the Agencies for their review. The Debtor complied with all substantive deadlines through the Petition Date, made all civil penalty payments required by the Consent Decree, and had been continuing to work cooperatively with the Agencies to address the other pending/ongoing requirements and issues raised by the Agencies.

By letter dated September 11, 2018, USDOJ and the NYS AG demanded stipulated penalties under the Consent Decree of $2,434,400 for alleged failure to battery repairs, alleged failure to perform weekly analysis of quench water, alleged failure to inspect quench towers on a monthly basis, alleged failure to operate and maintain a leak detection system, alleged failure to make monthly inspections, alleged failure to comply with leak detection requirements of the Consent Decree, and alleged failure to comply with NESHAP requirements of the Consent Decree. On October 10, 2018, the Debtor invoked its right to dispute resolution.

## C.    **Criminal Judgment**

On December 23, 2009, Federal agents exercised a search warrant at the Site for the seizure of documents and materials associated with the Debtor's operation and/or environmental compliance.

On March 28, 2013, after a month long trial, a jury convicted the Debtor and its environmental manager of nineteen counts of violating the Clean Air Act, and three counts of violating the Resource Conservation and Recovery Act ("RCRA"). *See United States v. Tonawanda Coke Corporation*, 10-cr-00219, Dkt. 281 (W.D.N.Y.) (the "Criminal Judgment"). Ultimately, the environmental manager received a fine in the tens of thousands of dollars, and a one year jail sentence. On March 19, 2014, TCC was sentenced with the imposition of a criminal fine, as well as a probationary obligation for a term of five years. The criminal fine was in the amount of $12,500,000, payable in five annual installments of $2,500,000, for which the first installment was paid in the year ended June 30, 2014. Additionally, as a condition of probation, TCC was required to fund two environmental impact studies in the amount of $12,200,000 over the same five year period in equal installments. Therefore, the total amount at issue by the sentence was approximately $24,700,000.

The Debtor appealed its RCRA convictions, as well as the condition of probation requiring it to fund the impact studies. In January 2016, the Second Circuit issued a summary order, denying the Debtor's appeal and affirming the District Court's judgment of conviction. *See United States v. Tonawanda Coke*, 14-1091, Dkt. 98 (2d Cir.). The Debtor moved for re-hearing with respect to its arguments regarding its RCRA convictions and the condition of probation. Id., Dkt. 101. On April 27, 2016, the Second Circuit denied the petition for re-hearing and, on May 4, 2016, it issued its judgment mandate. Id., Dkts. 105, 106. The Debtor did not request a writ of certiorari from the United States Supreme Court.

On August 24, 2018, the Government filed a "Petition for Offender Under Supervision" with the Federal Court claiming that the Debtor violated probation by not complying with the Consent Decree due to "violations of the waste heat stack opacity, as well as violations of Leak Detection and Repair (LDAR) requirements found in 40 C.F.R. §61.132 (NESHAP Subpart L),

among other violations." The Petition further alleged that "TCC's conduct constitutes criminal violations of the Clean Air Act, Title 42, U.S.C. §7413(c)(1), 7412; and violations of the Title V permit under 6 NYCRR 214." A hearing was held in the United States District Court for the Western District of New York ("District Court"), and as a result, on September 21, 2018, the terms of probation were modified to include certain repairs and an independent monitor.

The Debtor made all required criminal and probationary payments on time, with the exception of the last community service payment that was due on October 8, 2018. As counsel for TCC informed the District Court, its financing source did not make the previously anticipated loan, and as a result, it sought an extension of time to try and secure the funds necessary to make the final community service payment. That request was initially granted; however, on October 12, after learning that the Company was considering bankruptcy, the Government made a motion to make the community service payment due immediately, among other things, and the Court granted that motion. On October 15, the probation office was informed that TCC was unable to meet the terms of its probation including failure to make the required repairs by October 13 and further, that it could not make the final community service payment in the amount of $2,037,291.

The Debtor, through depletion of its working capital and various capital raises in the years prior to the bankruptcy filing, was ultimately able to pay $22,621,171 of its fines and probation payments.

On October 14, 2018, the Debtor began the process of shutting down its coke oven battery in cooperation with New York State Department of Environmental Conservation ("DEC") and United States Environmental Protection Agency ("EPA").

Accordingly, the Debtor's board of directors determined the Debtor would immediately file for relief under Chapter 11 of the Bankruptcy Code.

On October 18, 2018 (the "Petition Date"), TCC filed its Chapter 11 petition.

**D.     Financial Status on Petition Date:**

As of the Petition Date, the Debtor's books and records list approximately $6,400,000 in trade payable liabilities. The Debtor owes approximately $2,433,000 to entities that qualify as statutory "insiders." Additionally, the Government asserts a general unsecured claim of approximately $2,000,000 against the Debtor on account of the payment due as a condition of probation resulting from the Criminal Judgement.

As of the Petition Date, Honeywell was a secured creditor of the Debtor. Honeywell held a mortgage and security interest in the Debtor's real property in the principal amount of $8,080,303.00 and certain mortgage notes related to loans issued by Honeywell to the Debtor.

In the five years prior to the Petition Date, the Debtor's losses from operations total over $28 million.

## ARTICLE III.        EVENTS DURING THE CHAPTER 11 CASE

This section of the Disclosure Statement summarizes material events that have occurred in the bankruptcy case as of the date of filing of this Disclosure Statement. This is not an inclusive list of all matters that have occurred. Holders of claims are encouraged to review the docket in the bankruptcy case for a complete list of all matters that have been put before the Bankruptcy Court.

### A.    Retention of Debtor's Professionals.

Shortly after filing for bankruptcy, the Debtor filed applications to retain Hodgson Russ LLP as its Chapter 11 counsel and Chiampou Travis Besaw & Kershner LLP as its accountants. These applications were granted by the Court. The Debtor also filed applications seeking authority to retain Lippes Mathias Wexler Friedman LLP as conflicts counsel. On July 10, 2019 an order was entered authorizing the Debtor to engage PPL Acquisition Group II, LLC ("PPL") as an auctioneer of its personal property. The Debtor sought Court approval to retain Blackbird Asset Services, LLC ("Blackbird") as auctioneer of its real property pursuant to Section 327(a) of the Bankruptcy Code by application dated July 30, 2019. The Court approved Blackbird's retention by order dated August 14, 2019.

The Debtors' Professionals and the Committee's Professionals have filed interim fee applications during the course of the Chapter 11 case and have been awarded fees and disbursements as follows:

| Applicant | Fees Awarded | Disbursements Awarded | Total Awarded |
|---|---|---|---|
|  |  |  |  |
| Hodgson Russ LLP, *Counsel to the Debtor* | $203,368.50 | $7,751.30 | $211,119.80 |
| Hodgson Russ LLP, *Counsel to the Debtor* | $39,219.50 | $3,814.61 | $43,034.11 |
| Hodgson Russ LLP, *Counsel to the Debtor* | $48,492.00 | $3,282.21 | $51,774.21 |
| Hodgson Russ LLP, *Counsel to the Debtor* | $71,621.55 | $2,797.62 | $74,419.17 |
| Hodgson Russ LLP, *Counsel to the Debtor* | $48,497.85 | $2,539.01 | $51,036.86 |
| Hodgson Russ LLP, *Counsel to the Debtor* | $33,321.60 | $148.20 | $33,469.80 |
| Hodgson Russ LLP, *Counsel to the Debtor* | $46,427.40 | $270.92 | $46,698.32 |
| Lippes Mathias Wexler Friedman LLP, *Special Counsel to the Debtor* | $5,000.00 | $0.00 | $5,000.00 |
| Hodgson Russ LLP, *Counsel to the Debtor* | $11,024.55 | $258.70 | $11,283.25 |
| Chiampou Travis Besaw & Kershner, *Accountant to the Debtor* | $5,776.00 | $0.00 | $5,776.00 |

| | | | |
|---|---|---|---|
| Hodgson Russ LLP, *Counsel to the Debtor* | $6,480.00 | $51.18 | $6,531.18 |
| Hodgson Russ LLP, *Counsel to the Debtor* | $21,532.95 | $202.87 | $21,735.82 |
| Chiampou Travis Besaw & Kershner, *Accountant to the Debtor* | $3,179.50 | $0.00 | $3,179.50 |
| Hodgson Russ LLP, *Counsel to the Debtor* | $37,789.65 | $75.42 | $37,865.07 |
| Chiampou Travis Besaw & Kershner, *Accountant to the Debtor* | $6,213.50 | $683.12 | $6,896.62 |
| Hodgson Russ LLP, *Counsel to the Debtor* | $61,645.05 | $1,771.96 | $63,417.01 |
| | | | |
| **TOTAL** | **$649,589.60** | **$23,647.12** | **$673,236.72** |

## B.    Filing of the Schedules and Statement of Financial Affairs.

On the Petition Date, TCC filed its detailed schedules of assets and liabilities and statement of financial affairs (collectively, the "Schedules") with the Bankruptcy Court. In the Schedules, TCC listed assets having a book value of $26,591,000.00 and liabilities totaling $14,490,404.89. On December 19, 2018, the Debtor filed an amended schedule of unsecured creditors. On January 22, 2019, the Debtor filed an amended statement of financial affairs.

## C.    Appointment of Creditors' Committee.

On July 15, 2019, the Office of the United States Trustee appointed the Official Committee of Unsecured Creditors. The Committee consists of Coopers Creek Chemical Corporation, Corfu Machine Co. Inc. and Southern Minerals, Inc. The Committee sought and was granted authority to retain Baumeister Denz LLP as its counsel.

## D.    Asset Sales

After the shutdown of its coke ovens, the Debtor determined that a liquidation of its real and personal property could maximize the potential recovery for creditors. Accordingly, on or about April 2019, TCC filed and served a motion seeking authority to retain PPL as auctioneer and for the Bankruptcy Court's approval to conduct an auction sale of substantially all of its personal property. By order dated May 22, 2019, the Court granted the motion and approved an on-line auction sale of the Debtor's personal property.

PPL conducted an on-line auction of the Debtor's personal property which began on July 18, 2019 and concluded on August 12, 2019. The auction resulted in net proceeds payable to the Debtor in the amount of $599,988.48.

The Debtor obtained Court approval for the retention of Blackbird for the sale of its real property and certain fixtures based on a July 30, 2019 Retention Auction Agreement. Blackbird

marketed the Debtor's parcels of real property and prepared for a public auction of the following real property:

> 3705 River Road (64.12-1-14) – 3.01 acres
> 3783 River Road (64.12-1-17) – 5.09 acres
> 3800 River Road (64.12-4-3) – 25.99 acres
> 3875 River Road (64.08-1-10) – 102.42 acres
> 4008 River Road (64.08-1-2) - 0.13 acres

On August 16, 2019 the Court approved bid procedures for the sale of the real property and scheduled an auction for September 23, 2019. The Auction was conducted by the Court, no competing bids were submitted and Riverview Innovation and Technology Campus, Inc. ("Riverview") was selected as the winning bidder. Riverview's consideration for the purchase of the properties was payment of approximately $193,000.00 in back taxes and satisfaction of the mortgages and security interest of Honeywell in the principal amount of $8,080,303.00. Honeywell retained its unsecured claims against the Debtor subject to the Debtor's review and potential objection to same. Riverview also purchased certain fixtures for $75,000.00. The Court approved the sale by order dated September 23, 2019.

### E.  Recovery of Assets from Debtor's Affiliates.

The Debtor and Creditors' Committee entered into a Stipulation and Order dated September 18, 2020 to provide the Committee standing to pursue certain causes of action against statutory insiders and affiliates of the Debtor. On October 15, 2020 the Committee filed an adversary proceeding against Tamroy, Inc., James Crane as executor of the estate of James Donald Crane, Robert A. Bloom, Michael K. Durkin and Paul A. Saffrin (collectively, the "Defendants"). The Complaint sought the recovery of certain purported avoidable transfers received by one or more of the Defendants. The Committee and the Defendants settled the litigation pursuant to a stipulation approved by the Court on July 12, 2022. The Settlement required the Defendants to make a payment of $200,000.00 to the Debtor's estate and waive their claims pursuant to Section 502(h) of the Bankruptcy Code. The settlement proceeds are held in trust by Debtor's counsel. This settlement resolved and provided a release for the Defendants related to any claims held by the Estate against the Defendants.

### F.  Settlement of Claims against Powers Coal and Coke.

Prior to the Petition Date, the Debtor and Powers Coal and Coke, LLC ("Powers") entered into a Purchase and Agency Agreement (the "Powers Agreement"), dated as of September 11, 2018, pursuant to which: (i) the Debtor sold Powers the Acquired Assets (as more specifically defined in the Powers Agreement) which included existing inventory of coal, coke and other by-products produced by the Debtor and certain accounts receivable; and (ii) the Debtor appointed Powers as its exclusive agent to (a) procure, manage inventories for, and coordinate delivery of all coal requirements for the Debtor's business and (b) purchase all coke and by-products produced by the Debtor from and after September 11, 2018 for resale to third-parties.

Prior to the Debtor's entry into the Powers Agreement it was indebted to Powers for purchases of coal products in the amount of $2,195,817.00 (the "Outstanding Powers Receivable"). Through the Powers Agreement, the Debtor was deemed to have paid off the Outstanding Powers Receivable as a setoff for amounts owed by Powers to the Debtor under the Powers Agreement.

Following the Petition Date, Powers filed both a general unsecured claim and an administrative claim against the Debtor's estate. The pre-petition general unsecured claim (Proof of Claim No. 102) was filed as "unliquidated" but asserted in excess of $1,000,000.00 was owed to Powers. The administrative claim (Proof of Claim No. 116) sought $2,183,195.65 for amounts due and owing from and after the Petition Date related to Powers' agency role under the Powers Agreement.

The Debtor and Committee contacted Powers and asserted that it had received preferential transfers in connection with the setoff of the Outstanding Powers Receivable in excess of $2.1 million. On or around August 13, 2020, the Debtor and Powers entered into a settlement agreement pursuant to which Powers agreed to pay the estate $425,000.00 and withdraw its claims. The settlement was approved by Order of the Court dated September 16, 2020 [Docket No. 566].

## G.   Settlement of EPA and New York Department of Labor Claims.

The EPA filed a proof of claim (Proof of Claim No. 53) (the "EPA Proof of Claim"), asserting a general unsecured claim for: (a) $2,002,200 in stipulated penalties that accrued prior to the Petition Date under the Consent Decree and (b) $11,826.14 in response costs incurred prior to the Petition Date under the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601-9675 ("CERCLA"), in connection with the initial stages of a removal action at the Site.

The EPA Proof of Claim included a protective proof of claim relating to the Debtor's liability for the post-petition response costs incurred, and to be incurred, by the United States under CERCLA in relation to EPA's continued removal action at the Site.

The EPA filed a Motion for Allowance of Administrative Claim, [Docket No. 282] which was amended [Docket No. 442] asserting an administrative claim in the amount of $5,531,521.10, under Section 503(b)(1) of the Bankruptcy Code, asserting response costs incurred after the Petition Date addressing releases and threatened releases of hazardous substances at the Site ("EPA Administrative Expense Motion").

The New York Department of Labor ("DOL") filed Claim No. 103-1 seeking administrative expense priority in the amount of $1,518,651.38 with respect to its claim against the Debtor under the New York State Worker Adjustment and Retraining Notification Act, New York Labor Law §§ 860-860-I ("DOL Proof of Claim").

The Debtor filed a motion [Doc. No. 399] supported by the Committee, to disallow and expunge the DOL Proof of Claim (the "Objection to DOL Claim").

After extensive negotiation between the Debtor, Committee, EPA and DOL the parties reached a settlement to resolve the EPA Proof of Claim, the EPA Administrative Expense Motion, the DOL Proof of Claim and the Objection to DOL Claim. A summary of the material terms of the Settlement Agreement entered into by and among the Debtor, the Committee, the EPA and the DOL (the "EPA/DOL Settlement Agreement") is below:[1]

- The EPA received the following allowed claims:

  o general unsecured claim of $2,002,200 for stipulated penalties under the Consent Decree (hereinafter "EPA Allowed Stipulated Penalty Claim");

  o general unsecured claim of $11,826.14 for pre-petition response costs incurred at the Site (hereinafter "EPA Allowed Pre-Petition Response Cost Claim");

  o an initial administrative claim of $930,000 for post-petition response costs incurred at the Site—such claim was paid in full within thirty days of the Effective Date under the EPA/DOL Settlement Agreement[2];

  o a supplemental administrative claim equal to 83.7% of the amount remaining in the Debtor's Estate after payment of: (i) all Allowed Administrative Claims, including Professional Fees, other than said EPA Supplemental Administrative Claim and the DOL Supplemental Administrative Claim, and (ii) the General Unsecured Claim Initial Carveout (as defined below).

- The Parties agreed to a carveout for general unsecured claims in the amount of the sum of:

  o $200,000 (the "General Unsecured Claim Initial Carveout"); and

  o The "General Unsecured Claim Supplemental Carveout," which shall equal 10% of the amount remaining in the estate after payment or segregation of:

    ▪ all allowed administrative expense claims, including any Chapter 7 and Chapter 11 allowed administrative expense claims, other than the EPA Supplemental Allowed Administrative Expense Claim and the DOL Supplemental Allowed Administrative Expense Claim (as defined in Subparagraph 21.b of the Settlement Agreement); and

    ▪ the General Unsecured Claim Initial Carveout.

---

[1]    This summary of the EPA/DOL Settlement Agreement is provided for the convenience of the Court and the parties in interest and it is qualified by the terms of the EPA/DOL Settlement Agreement. Reference should be made to the complete EPA/DOL Settlement Agreement [Docket No. 586-1]. The terms of the Settlement Agreement shall supersede the terms of this summary in all instances.

[2]    The EPA's and DOL's initial allowed administrative expense claims were paid by the Debtor from proceeds of its disposition of real and personal property during the case.

- The DOL agreed that, in full resolution of the DOL Proof of Claim, it shall have an allowed administrative expense claim ("DOL Allowed Administrative Expense Claim") in the amount of the sum of:

  o $70,000 (the "DOL Initial Allowed Administrative Expense Claim") which has been satisfied; and

  o the "DOL Supplemental Allowed Administrative Expense Claim," which shall equal 6.3% of the amount remaining in the estate after payment or segregation of:

    ▪ all allowed administrative expense claims, including Chapter 7 and Chapter 11 allowed administrative expense claims, other than said DOL Supplemental Allowed Administrative Expense Claim (as defined in Subparagraph 21.b of the Settlement Agreement) and the EPA Supplemental Allowed Administrative Expense Claim, and

    ▪ the General Unsecured Claim Initial Carveout.

The EPA/DOL Settlement Agreement described above was approved by an Order of the Bankruptcy Court following a motion and notice on December 15, 2020 [Docket No. 601].

## H.     Motion to Compel turnover of property from Affinity Insurance Ltd.

The Debtor is a preferred shareholder in Affinity Insurance Ltd., an entity incorporated under the laws of the Cayman Islands ("Affinity"). Affinity is a "captive" insurance company. The Debtor was required to pay annual premiums and assessments to Affinity. As a preferred shareholder the Debtor is also entitled to distributions from Affinity stemming from excess equity for each policy year, a pro-rata share of investment income from capital securing the insurance coverage, and a return of premium security collateralization.

The Debtor's one "redeemable preferred" share in Affinity is owned jointly with Erie Coke Corporation ("ECC") with each entity owning fifty percent. Affinity provided the Debtor with Workers' Compensation, General Liability, and Auto Liability and Auto Physical Damage coverage.

Affinity expects to make distributions to its preferred shareholders, including the Debtor and ECC each year through 2026. On or about January 10, 2023, the Debtor received its 2022 distribution from Affinity in the amount of $166,147.50. On or about March 1, 2023, the Debtor received a distribution of $100,516.00 from Affinity for 2023. In 2024 the Debtor received a distribution from Affinity in the amount of $294,878.

Distributions from Affinity should occur once each year for the next three years approximately in March of each year.

The Debtor and ECC will share equally in the distributions to be made from Affinity, the Debtor and ECC shall each receive a distribution for the next three years. In future years the Debtor would receive an estimated distribution in the following amounts:

2025: $175,000

2026: $254,000

These calculations are only estimates and the actual distribution may vary. All distributions received by the Debtor remain subject to the EPA/DOL Settlement Agreement.

**I.      The Proof of Claims Bar Date.**

On June 5, 2019, the Bankruptcy Court entered an order setting August 9, 2019 at 5:00 p.m. as the deadline for creditors (other than governmental entities) to file claims.

**J.      Administrative Claims Bar Date.**

On December 13, 2019, the Bankruptcy Court entered an order setting February 10, 2020 at 4:00 p.m. as the deadline for creditors to file administrative claims which arose prior to December 31, 2019.

**K.      Post-Petition Operations.**

The Debtor did not operate as a going-concern during the pendency of the Bankruptcy Case and focused solely on maximizing the value of its assets.

**L.      Funding For Chapter 11 Plan.**

The Plan will be funded by the proceeds of the various settlements obtained during the course of this case as well as distributions received and to be received from Affinity. As is set forth in the Sources and Uses Of Cash exhibit (attached hereto as **Exhibit "B"**), the Debtor has accumulated cash in the amount of $1,125,865 as of August 31, 2023.

**ARTICLE IV.      DESCRIPTION OF THE PLAN**

**A.      Overview.**

The Plan is a plan of liquidation that provides for payment to creditors from (i) funds already accumulated and in the possession of Debtor's Chapter 11 counsel and (ii) funds to be received from Affinity in the next several years as described above.

Under the circumstances, the Debtor believes that a liquidation in accordance with the terms of the Plan, including all settlements and compromises contained in the Plan, is fair, appropriate, and in the best interests of the Debtor and all parties in interest.

**B.      Administrative Expense and Priority Tax Claims; Administrative Claim Bar Date.**

Administrative Claims are specified in section 503 of the Bankruptcy Code and generally include those expenses related to the administration of the Bankruptcy Case, principally the fees and expenses of Professionals retained by the Debtor and priority Tax Claims set forth in sections 502(i) and 507(a)(8) of the Bankruptcy Code. Under the Bankruptcy Code, these Claims may not be "classified" and must be paid in full and in Cash to confirm the Plan.

The Bankruptcy Court fixed February 10, 2020 at 4:00 p.m. as the deadline for creditors to file Administrative Claims which arose prior to December 31, 2019. During the pendency of the case the Debtor undertook a thorough review of all claims asserting administrative priority, including but not limited to priority under section 503(b)(9) of the Bankruptcy Code. The Debtor filed a number of objections to claims and now believes all Allowed Administrative Claims have been paid in full, other than claims incurred in the ordinary course of the Debtor's post-petition activity after December 31, 2019 bar date.

Under the Plan, all Administrative Claims that arose after December 31, 2019, other than Claims for Professional Fees, must be filed no later than thirty (30) days following the Effective Date or otherwise be barred for all purposes by operation of the Plan. Both Administrative Claims and Priority Tax Claims that are Allowed will be paid in full under the Plan. Other than Professional Fees, the Debtor does not believe that there will be any Administrative Expenses other than regular trade debt payable in the ordinary course of business.

The Debtor is aware of an unpaid Priority Tax Claim for $5,156.86 due and owing to the Internal Revenue Service, which will be paid in full on the Effective Date.

The Debtor is not aware of any unpaid Priority Claims under section 507(a)(4) and (5) of the Bankruptcy Code for back pay and benefits for terminated employees, and claims for unused paid time off held by employees whose services were terminated before the benefit could be utilized.

**C.      Classification and Treatment of Claims and Interests.**

Section 1123(a)(1) of the Bankruptcy Code requires that the Debtor designate Classes of Claims, other than Administrative Claims and Priority Tax Claims, under the Plan consistent with section 1122 of the Bankruptcy Code. The classification set forth in the Plan is applicable for purposes of voting, distribution and confirmation of the Plan.

Set forth below are the Classes of Claims and Interests under the Plan, as well as whether or not such Classes are "impaired" within the meaning of the Bankruptcy Code. Only impaired Classes may vote on the Plan. Unimpaired classes are deemed to accept the Plan and may not vote. Impaired classes that will not receive or retain any property under the Plan are deemed to reject the Plan and may not vote.

**1.      Classification and Treatment of Classified Claims.**

*Class 1 — Allowed Priority Claims.* Class 1 Claims are not impaired under the Plan. Priority Claims are Claims entitled to priority in payment under section 507 of the Bankruptcy

Code, other than Administrative Claims and Priority Tax Claims. Holders of Priority Claims that are Allowed will receive Cash in the full amount of such Priority Claim which has been Allowed, on (i) the Effective Date or as soon as practicable after such claims or portion of such claims become Allowed Claims or (ii) as may be otherwise agreed in writing between the Debtor and the holder of the Priority Claim. The Debtor estimates that Allowed Class 1 Claims total approximately $0.00.

*EPA and DOL Supplemental Claims.* If after payment of all amounts contemplated under the Plan to be paid or reserved on or immediately after the Effective Date, there is Available Cash, the EPA shall receive 83.7% of such Available Cash and the DOL shall receive 6.3% of such Available Cash; provide, however, that in no event shall (i) the EPA receive for its EPA Supplemental Administrative Claim an amount in excess of $5,531,521.10 minus the Initial EPA Administrative Claim and (ii) the DOL receive for its DOL Supplemental Administrative Claim an amount in excess of $1,518,651.38 minus the Initial DOL Administrative Claim.

*Class 2 — General Unsecured Claims.* Class 2 Claims are impaired and entitled to vote to accept or reject the Plan. Class 2 consists of General Unsecured Claims including the EPA General Unsecured Claim but excluding all Tort Claims. Unless otherwise agreed to by the holder of such Class 2 Claim, on the later of (a) the Effective Date, or as soon thereafter as reasonably practicable and (b) for Disputed Claims, the date on which such Claim becomes an Allowed General Unsecured Claim, each holder of an Allowed General Unsecured Claim will receive a Pro Rata distribution of (i) the General Unsecured Claim Initial Carveout and (ii) the General Unsecured Claim Supplemental Carveout, in each case, minus the amount of Cash set aside for the Tort Claims Reserve (the "Non-Tort Claim Assets").

*General Unsecured Claim Supplemental Carveout.* If after payment of all amounts contemplated under this Plan to be paid or reserved on or immediately after the Effective Date, there is Available Cash, the Class 2 Creditors holding Allowed General Unsecured Claims shall receive a Pro Rata distribution of ten (10%) of such additional Available Cash, if any, from the Plan Administrator.

The filed and scheduled Class 2 Claims total approximately $16 million.

*Class 3 — Tort Claims.* Class 3 Claims are impaired and entitled to vote to accept or reject the Plan. Class 3 Claims consists of the Tort Claims all of which are currently Disputed Claims. Subject to Plan Section 8.4(g), any Tort Claim as to which a Proof of Claim was timely filed will be determined and liquidated either in the administrative or judicial tribunal in which it is pending on the Effective Date, or if no action is pending on the Effective Date, in any administrative or judicial tribunal of appropriate jurisdiction, or in accordance with any alternative dispute resolution or similar proceedings as the same may be approved by Order of the Bankruptcy Court. The Debtor reserves the right to seek estimation of any and all Tort Claims in a court or courts of competent jurisdiction. To the extent that a Tort Claim is determined and liquidated pursuant to a final, nonappealable judgment in such a tribunal or in any such alternative dispute resolution or similar proceeding, such Tort Claim shall be deemed an Allowed Class 3 Claim and be satisfied from a Pro Rata distribution from the Tort Claims Reserve. The Tort Claims Reserve will be funded with the Tort Claims Assets (fifty (50%) percent of funds comprising the General Unsecured Claim Initial Carveout and the General Unsecured Claim Supplemental Carveout.

**Holders of Tort Claims shall have twelve (12) months from the Effective Date to have the liability of the Debtor determined by a Final Order of a court of competent jurisdiction other than the Bankruptcy Court unless such period is otherwise extended by: (i) written agreement of the Plan Administrator and holder of the Tort Claim or (ii) pursuant to a Final Order of the Bankruptcy Court following a motion requesting an extension on notice to the Plan Administrator (such date being the "Tort Claim Allowance Deadline"). If a holder of a Tort Claim does not have the Debtor's liability determined by a Final Order of a court of competent jurisdiction on or prior to the Tort Claim Allowance Deadline, such Tort Claim shall automatically be disallowed and all liability of the Debtor with respect to such Tort Claims are deemed satisfied and released without further action by the Plan Administrator or an Order of the Bankruptcy Court.**

*Class 4 — Interest Holders* Class 4 Claims are impaired and Interest holders are conclusively deemed to reject the Plan under Section 1126(g) of the Bankruptcy Code and are therefore not entitled to vote to accept or reject the Plan. On the Effective Date, Interests shall be deemed cancelled, and the holders of Interests shall not receive or retain any property under the Plan on account of such Interests.

**2.      Claims May Be in More Than One Class.**

A Claim is part of a particular Class only to the extent that the Claim qualifies within the definition of that Class and such Claim is part of a different Class to the extent that the remainder of the Claim qualifies within the description of a different Class. A Claim is also placed in a particular Class for the purposes of the Plan only to the extent the Claim is an Allowed Claim and the Claim has not been paid, released or otherwise settled prior to the Effective Date.

**3.      Impairment, Classification, and Related Disputes.**

A holder of a Claim may dispute the classification of a Claim or the treatment of a Class (including whether a Class is impaired or unimpaired), by objecting to the Plan or otherwise filing an appropriate motion to challenge the classification, characterization or treatment of the Claim or the Class. The deadline to file any such motion or objection is the deadline set by the Bankruptcy Court to object to confirmation of the Plan. If the Bankruptcy Court does not grant the motion or otherwise confirms the Plan without conditioning confirmation upon any grounds raised in such a motion or objection, the treatment, characterization, and classification set forth in the Plan will be binding upon all holders of Claims.

**D.      Acceptance or Rejection of the Plan.**

**1.      Classes and Claims Entitled to Vote.**

Creditors in Class 1 are unimpaired and are deemed to accept the Plan. Holders of Claims in Classes 2 and 3 are impaired and may vote on the Plan. Holders of Class 4 Claims are deemed to reject the Plan.

**2.     Acceptance by a Class of Claims.**

Except as provided in section 1126(e) of the Bankruptcy Code, a Class of Claims will accept the Plan if holders of one-half in number and two-thirds in amount of Claims in that Class, actually voting, timely and properly vote to accept the Plan.

**3.     Cramdown.**

The Debtor reserves the right to request that the Bankruptcy Court confirm the Plan if one or more of Classes 2 and 3 votes to reject the Plan, because the Plan is fair and equitable and does not discriminate unfairly with respect to such classes.

**E.     Effects of Confirmation.**

**1.     Revesting of Assets.**

Pursuant to section 1141(b) of the Bankruptcy Code, except as otherwise provided for in the Plan, property of the Estate shall revest in the Debtor upon the Effective Date, under the exclusive control of the Plan Administrator, until distributed to holders of Allowed Claims in accordance with the provisions of the Plan and the Confirmation Order.

**2.     Preservation and Retention of Defenses of the Debtor and Rights to Object to Claims and Interests.**

Confirmation of this Plan will have no impact upon, and will not render res judicata:  (i) any defenses the Debtor may have (including rights of setoff) in any action brought against it; or (ii) any party's right to object to any Claim against the Debtor, subject to any limitation expressly set forth in this Plan.

**3.     Authority to Effectuate the Plan.**

Except as expressly set forth in the Plan, on the Effective Date, all matters provided for under the Plan will be authorized and approved without further approval or order of the Bankruptcy Court.

**4.     No Waiver of Legal Privileges.**

Confirmation of the Plan will not waive the attorney/client, work product, or other legal privileges of the Debtor.

**F.     Means of Implementation of the Plan.**

**1.     Continued Existence of the Debtor.**

The Debtor and the Plan Administrator shall take all necessary steps, and perform all necessary acts, to consummate the terms and conditions of the Plan.  The Confirmation Order shall contain appropriate provisions, consistent with Section 1142 of the Bankruptcy Code, directing the Debtor and any other necessary party to execute or deliver or to join in the execution or delivery

of any instrument required to effect a transfer of property required by the Plan and to perform any act, including the satisfaction of any Lien, that is necessary for the consummation of the Plan. Pursuant to Section 1146 of the Bankruptcy Code, the issuance, transfer, or exchange of any security and the making or delivery of any instrument of transfer in connection with or in furtherance of the Plan or the sale shall not be subject to Transfer Tax.

The Plan will be administered by the Plan Administrator and all actions taken under the Plan in the name of the Debtor shall be taken through the Plan Administrator. Upon the distribution of all Assets pursuant to the Plan and the filing by the Plan Administrator of a certification to that effect with the Bankruptcy Court (which may be included in the application for the entry of the Final Decree), the Debtor shall be deemed dissolved for all purposes without the necessity for any other or further actions to be taken by or on behalf of the Debtor or payments to therewith, provided, however, that the Debtor may, but will not be required to, take appropriate action to dissolve under applicable law.

2. **Entity Governance Documentation.**

The Debtor shall not issue securities and the Plan will constitute an amendment to its organizational documents to prohibit the issuance of non-voting equity securities.

3. **The Plan Administrator.**

a. **Appointment.**

On the Effective Date, unless notice of the appointment of a third party Plan Administrator has been filed with the Court, the Debtor shall serve as Plan Administrator. Michael Durkin will be primarily responsible for carrying out the Plan, solely in his capacity as president of the Debtor and not in an individual capacity.

b. **Rights, Powers, and Duties of the Debtor and the Plan Administrator.**

The Plan Administrator will have all of the rights, powers, and duties necessary to carry out its responsibilities under this Plan and to effectuate the terms of this Plan.

c. **Compensation of the Plan Administrator.**

If the Plan Administrator is not the Debtor, it will be entitled to be compensated from the Assets. If the Plan Administrator is the Debtor, it will not be entitled to compensation for acting in such role, although it will be permitted to retain and pay the expenses of professionals such as attorneys and accountants to assist in the discharge of its duties. Any compensation payable to the Plan Administrator shall be based on the hourly rates of the Plan Administrator and of those persons employed by the Plan Administrator to effectuate the terms of the Plan, as well as the other expenses incurred to effectuate the Plan. If permitted hereunder, the Plan Administrator may pay itself compensation from the Assets without prior order of the Bankruptcy Court. Unless otherwise ordered by the Bankruptcy Court, and if the Plan Administrator is not the Debtor, then the Plan Administrator shall file a notice with the Bankruptcy Court on a quarterly basis summarizing all compensation paid to the Plan Administrator from and after the Effective Date.

#### d. Limitations on Liability.

The Plan Administrator shall not incur liability to any Entity by reason of discharge of its duties as set forth in the Plan, except in the event of gross negligence or willful misconduct.

#### e. Retention of Professionals.

The Plan Administrator may retain attorneys, accountants, or other professionals to represent the interests of the Plan Administrator or the Debtor in a commercially reasonable manner, including attorneys, accountants, and other professionals previously employed by the Debtor. The Plan Administrator may compensate such Professionals from the Assets without prior order of the Bankruptcy Court. If the Debtor is the Plan Administrator, it will retain its existing professionals, Hodgson Russ LLP as legal counsel and Chiampou Travis Besaw & Kershner LLP as its accountants at hourly rates previously approved by the Court, subject to annual adjustment.

### G. Provisions for the Resolution of Claims Against the Debtor and Disposition of Assets.

#### 1. Objection to and Resolution of Claims Against the Debtor.

##### a. Authority to Object to and Resolve Objections to Claims.

The Plan Administrator may prosecute, settle, or decline to pursue objections to any Claims against the Debtor in accordance with the terms of the Plan, whether objections to the Claims were filed prior to or after the Effective Date.

##### b. Limitations on Filing Objections to Claims and Interests.

From and after the Effective Date, no party other than the Plan Administrator may object to Claims.

##### c. Deadline for objection to Claims and Interests.

Unless otherwise specified in the Plan, the deadline to file any objections to Claims, including Administrative Claims that are not subject to a pending objection on the Effective Date is 60 days after the Effective Date. The Plan Administrator is not required to file claim objections against parties which have filed Tort Claims as they are Disputed Claims pursuant to the terms of the Plan. The Plan Administrator may seek one or more extensions from the Bankruptcy Court of the time to file an objection to any Claim. The filing of a motion by the Plan Administrator to extend the time to file an objection to a Claim will automatically extend the date by which the Plan Administrator must file objections to a timely filed Claim until a Final Order is entered on the motion.

##### d. Compromise of Disputed Claims.

From and after the Effective Date, the Plan Administrator may settle or compromise any Disputed Claim (including any Tort Claim) or retained Cause of Action pursuant to the terms of the Plan without further order of the Bankruptcy Court.

e.     **Estimation of Claims.**

The Plan authorizes the Plan Administrator to request that the Bankruptcy Court estimate any Claim, including any claims for taxes, pursuant to section 502(c) of the Bankruptcy Code. Claims may be estimated by the Bankruptcy Court (or the District Court, if applicable) and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court (or the District Court, if applicable).

2.     **Liquidation of Assets.**

a.     **Plan Administrator May Sell or Dispose of Estate Assets.**

From and after the Effective Date, the Plan Administrator may use, sell, assign, transfer, abandon, or otherwise dispose of the Assets in a commercially reasonable manner at a public or private sale without Bankruptcy Court approval. The proceeds from the liquidation of any assets will be used to fund the implementation of the Plan and distributed according to the provisions of the Plan.

H.     **Distributions.**

1.     **Distributions on Account of Allowed Administrative Claims.**

Subject to rights of set-off preserved under the Plan, the Plan Administrator will pay any outstanding Allowed Administrative Claims in full, in Cash, on or as soon as practicable after the later of (a) the initial Distribution Date, or (b) the date that is ten (10) Business Days after the Claim becomes an Allowed Administrative Claim; or (c) at such other time and in such other manner as may be agreed upon in writing between the holder of the Allowed Administrative Claim and the Plan Administrator.

2.     **Distributions on Account of Allowed Priority Tax Claims.**

Subject to rights of set-off preserved under the Plan, in the Plan Administrator's discretion, the Plan Administrator will pay Allowed Priority Tax Claims (a) in full, and in Cash, or (b) in accordance with such other treatment as may be agreed upon in writing by the holder of such Claim and the Plan Administrator, in accordance with the terms of the Plan. The Plan Administrator will pay Priority Tax Claims on or as soon as practicable after the later of (a) the initial Distribution Date, or (b) the date that is ten (10) Business Days after the Claim becomes an Allowed Priority Tax Claim; or (c) at such other time and in such other manner as may be agreed upon in writing between the holder of the Allowed Priority Tax Claim and the Plan Administrator.

3.     **Distributions on Account of Allowed Claims.**

Any Claim (other than those related to Tort Claims) that is not a Disputed Claim on or prior to the expiration of the deadline for filing Claim objections set forth above shall automatically be deemed to be an Allowed Claim without any further notice to or action, order, or approval of the Bankruptcy Court. Subject to rights of set-off preserved under the Plan, on the Distribution Date, the Plan Administrator will distribute Cash to each holder of a Claim in Classes 1 through 3 that is Allowed or becomes Allowed as provided in the Plan. Subject to rights of set-off preserved

under the Plan, for Claims Allowed after the initial Distribution Date, the Plan Administrator will make a distribution to the holder of such an Allowed Claim on the first Distribution Date after such Claim or Interest is Allowed an amount equal to the amount that would have been paid o the holder if the Claim had been Allowed prior to the initial Distribution Date.

### a. Claims Allowed Prior to the Effective Date.

Subject to rights of set-off preserved under the Plan, on the Distribution Date, the Plan Administrator will distribute Cash to each holder of a Claim in Classes 1 through 3 that is Allowed prior to the Effective Date as provided in the Plan.

### b. Claims Allowed on or After the Effective Date.

Subject to rights of set-off preserved under the Plan, for Claims Allowed on or after the Effective Date, the Plan Administrator will make a distribution to the holder of such an Allowed Claim on the first Distribution Date after such Claim or Interest is Allowed in an amount equal to the amount that would have been paid to the holder if the Claim had been Allowed prior to the initial Distribution Date.

### 4. Distributions Paid to Holders of Record.

The Plan Administrator will make Distributions under the Plan to the holder of record of the Allowed Claim. For purposes of making Distributions, the following applies: (i) if no Proof of Claim has been filed, the holder of record and its address will be as identified in the Schedules; (ii) if a Proof of Claim has been filed, the holder of record and its address will be as identified in the Proof of Claim; (iii) if a notice of transfer of Claim has been properly filed pursuant to Rule 3001(e) of the Bankruptcy Rules not less than thirty days prior to any Distribution Date and no objection to the transfer of Claim has been filed, then to the holder of record and its address as identified on the notice of transfer of Claim as filed with the Bankruptcy Court.

### 5. No Distributions on account of Disputed or Disallowed Claims.

Except as may otherwise be ordered by the Bankruptcy Court or authorized under the terms of the Plan, the Plan Administrator will make no Distribution to the holder of a Disputed Claim until the Disputed Claim becomes an Allowed Claim. The Plan Administrator will not make any Distributions to holders of Disallowed Claims.

### 6. Setoff.

The Plan Administrator is authorized, pursuant to and to the extent permitted by applicable law, to set off against any Allowed Claim and the distributions to be made on account of such Allowed Claim, the claims, rights, and Causes of Action of any nature that the Debtor or the Plan Administrator, as applicable, may hold against the holder of such Allowed Claim. Neither the failure to effect such a setoff nor the allowance of any Claim under the Plan shall constitute a waiver or release by the Debtor or the Plan Administrator of any such claims, rights, and Causes of Action the Debtor or the Plan Administrator, as applicable, may have against such holder.

## 7. The Disputed Claims Reserve.

On or before the Effective Date, the Debtor shall establish and fund the Disputed Claims Reserve for non-Tort Claims and the Tort Claim Reserve for all Tort Claims, each of which shall be administered by the Plan Administrator.

Unless otherwise agreed to in writing by the Debtor and the holder of any Claim, but not an Interest, to which Section 8.9(a) of the Plan applies, on the Effective Date, the Plan Administrator shall deposit in one or more segregated accounts, Cash equal to the amount necessary to fund (i) the Disputed Claim Reserve and (ii) the Tort Claim Reserve with the Tort Claim Assets (equal to fifty percent (50%) of funds comprising the General Unsecured Claim Initial Carveout and the General Unsecured Claim Supplemental Carveout). The Plan Administrator shall also segregate any interest, dividends or proceeds of such Cash. Such Cash together with any interest, dividends or proceeds thereof, shall be held in trust for the benefit of the holders of all such Disputed Claims pending determination of their entitlement thereto.

The reserve amount for all Disputed non-Tort Claims shall be equal to a Pro Rata percentage of the Non-Tort Claim Assets (the "Disputed Claim Reserve").

In determining the amount of the Cash or property to be distributed under the Plan on account of Disputed Claims, the calculation of the distribution to each holder of an Allowed Claim in such class shall be made as if all Disputed Claims in the applicable class were Allowed Claims in their respective face amounts. With respect to the Disputed Claims Reserve, this calculation shall not include the face amounts of the Tort Claims. With respect to the Tort Claims Reserve the calculation shall not include the face amount of non-Tort Claims.

The Plan Administrator shall have the right to seek an Order of the Bankruptcy Court, after notice and a hearing, estimating or limiting the amount of Cash or property that must be so deposited. Any Creditor whose Claim is so estimated or limited shall have no recourse to any assets theretofore distributed on account of any Allowed Claim, or any other Entity or property if the Allowed Claim of the Creditor (whose Claim was so estimated or limited) as determined by Final Order exceeds the amount so deposited. Instead, such Creditor shall have recourse only to the undistributed assets in the Disputed Claims Reserve or Tort Claims Reserve (as applicable) (on a Pro Rata basis with other Creditors of the same Class who are similarly situated) that exceed the aggregate amount of all Disputed Claims allowed by Final Order.

## 8. The Expense Reserve.

From and after the Effective Date, the Plan Administrator may establish and maintain a reserve (the "Expense Reserve") to fund the payments required to be made under this Plan, fees to the Clerk of the Bankruptcy Court, and fees to the United States Trustee, as well as to enable the Plan Administrator to pay post-Effective Date fees and expenses, including, without limitation, those incurred or to be incurred by Professionals employed by the Plan Administrator through the closing of this Bankruptcy Case and entry of a Final Decree. The Plan Administrator may, from time to time, recalculate and replenish the amount of the Expense Reserve. The Debtor estimates it will require $100,000 to initially fund the Expense Reserve.

9. **Maintenance of the Disputed Claims Reserve, the Expense Reserve, and other Cash of the Debtor and the Estate.**

Except as otherwise provided in the Plan, the Plan Administrator may hold Cash of the Estate in one or more accounts that the Plan Administrator determines to be in the best interests of the Estate. Any reference to the establishment or maintenance of any reserves contained in the Plan, including the Disputed Claims Reserve, Tort Claim Reserve and the Expense Reserve, will not require the Plan Administrator to establish separate deposit or similar accounts for such reserves. The establishment of reserves under the Plan may be accomplished by accounting, general ledger, paper, or other book entry, as the Plan Administrator may determine.

10. **Finality of Distributions.**

All Distributions made under the Plan are final, and no party may seek disgorgement of any Distributions made under this Plan.

11. **Manner of Payment; delivery of Distributions.**

Except as otherwise set forth in the Plan, the Plan Administrator or a duly-appointed disbursing agent will make all Distributions under the Plan in Cash made by check drawn on a domestic bank or by wire transfer from a domestic bank.

12. **Fractional Amounts.**

The Plan Administrator may elect not to make Distributions of Cash in fractions of dollars. Whenever any payment of a fraction of a dollar under the Plan would otherwise be called for, the Plan Administrator may round the amount of such Distribution to the nearest dollar (up or down).

13. **Minimum Cash Distributions.**

The Plan Administrator may elect not to make a Distribution of less than $25.00 to any holder of an Allowed Claim unless the Distribution is a Final Distribution. If, at any time, the Plan Administrator determines that the remaining Cash and other Assets are not sufficient to make Distributions to holders of Allowed Claims in an amount that would warrant the Estate incurring the cost of making such a Distribution, the Plan Administrator may dispose of such remaining Cash and other Assets in a manner the Plan Administrator deems to be appropriate, including a charitable donation.

14. **Compliance with Tax Requirements/Allocations.**

In connection with the Plan, the Debtor and, where applicable the Plan Administrator, shall comply with all withholding and reporting requirements imposed by federal, state and local taxing authorities and distributions under the Plan shall be subject to applicable withholding and reporting requirements; providing, however, that the transfer of any Cash, property or other interest hereunder shall not be subject to any federal, state or local tax to the fullest extent provided under Section 1146 of the Bankruptcy Code.

I. **Satisfaction of Claims, Injunctions, and Limitations of Liability.**

1. **No Discharge of Claims Against Debtor.**

Pursuant to section 1141(d)(3) of the Bankruptcy Code, confirmation of the Plan will **not** discharge Claims against the Debtor; provided, however, that no Creditor may, on account of its Claim, seek or receive any payment or other distribution from, or seek recourse against the Debtor, its successors or the Estate, for any property of the Estate that has been or will be distributed under the Plan or in violation of any other provision of this Plan.

2. **Injunction; Limitation of Liability.**

**Except (a) as otherwise provided in the Plan; or (b) as otherwise provided under the Confirmation Order entered by the Bankruptcy Court, the entry of the Confirmation Order shall forever stay, restrain and permanently enjoin with respect to any Claim or Interest held as of the Effective Date: (y) the commencement or continuation of any action, the employment of process, or any act to collect, enforce, attach, recover or offset from property of the Estate that has been, or is to be, distributed under the Plan, and (z) the creation, perfection or enforcement of any lien or encumbrance against any property of the Estate that has been, or is to be transferred or distributed under the Plan.**

**Limitation of Liability. No Exculpated Entity shall have or incur any liability to any entity for any action taken or omitted to be taken from the Petition Date through the Effective Date in connection with or related to the formulation, preparation, dissemination, Confirmation or consummation of the Plan, the Disclosure Statement, or any other action taken or omitted to be taken in connection with the Plan, except in the case of fraud, gross negligence, or willful misconduct. An "Exculpated Entity" is defined in the Plan to include the Debtor, the members of the Committee (solely in their capacities as members of the Committee), and each of their respective directors, officers, shareholders, members, partners, agents, employees, representatives, attorneys and other professionals, subsidiaries and affiliates, and any successor in interest. in any of them, but solely in their capacity as fiduciaries of the Debtor from and after the Petition Date.**

**EXCEPT AS OTHERWISE SPECIFICALLY PROVIDED FOR IN THE PLAN OR CONFIRMATION ORDER, AS OF THE EFFECTIVE DATE, THE RELEASING ENTITIES ARE DEEMED TO HAVE RELEASED THE EXCULPATED ENTITIES FROM ANY AND ALL CLAIMS, INTERESTS, OBLIGATIONS, RIGHTS, SUITS, DAMAGES, CAUSES OF ACTION, REMEDIES AND LIABILITIES WHATSOEVER, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, EXISTING OR HEREINAFTER ARISING, IN LAW, EQUITY, OR OTHERWISE, WHETHER FOR TORT, CONTRACT, VIOLATIONS OF FEDERAL OR STATE SECURITIES LAWS, OR OTHERWISE,THAT EACH RELEASING ENTITY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT, BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM THE PETITION DATE THROUGH THE EFFECTIVE DATE IN CONNECTION WITH OR RELATED TO THE FORMULATION, PREPARATION, DISSEMINATION, CONFIRMATION OR CONSUMMATION OF THE PLAN, THE DISCLOSURE STATEMENT, OR ANY OTHER ACTION TAKEN OR OMITTED TO BE**

**TAKEN IN CONNECTION WITH THE PLAN, EXCEPT IN THE CASE OF FRAUD, GROSS NEGLIGENCE, OR WILLFUL MISCONDUCT**

**All Creditors, including those that vote to reject the Plan, shall be bound to the releases set forth in Section 9.3 of the Plan**

3.      **No Liability for Solicitation or Participation.**

Neither the Debtor, the Exculpated Entities, nor any of their respective officers, directors, or employees (acting in such capacity) nor any professional person employed by any of them, shall have or incur any liability to any entity for any action taken or omitted to be taken in connection with or related to the formulation, preparation, dissemination, Confirmation or consummation of the Plan, the Disclosure Statement, or any other action taken or omitted to be taken in connection with the Plan, except in the case of fraud, gross negligence, or willful misconduct.

4.      **Term of Injunctions and Stays.**

Unless otherwise provided in the Plan or in another order of the Bankruptcy Court, all injunctions or stays provided for in the Bankruptcy Case pursuant to sections 105, 362, and 524 of the Bankruptcy Code, or otherwise, and in effect on the Confirmation Date shall remain in full force and effect until the Effective Date; provided however, that the provisions of section 362 of the Bankruptcy Code will remain in effect with respect to property of the Estate until entry of the Final Decree.

5.      **Release of Liens.**

Except as otherwise provided in the Plan or the Confirmation Order, all Liens, security interests, deeds of trust, or mortgages against property of the Debtor or the Estate shall and shall be deemed to be released, terminated, and nullified on the Effective Date, provided that payment of any Claim secured by a Lien, security interest, deed of trust, or mortgage has been made in accordance with the terms of the Plan.

6.      **Cancellation of Instruments.**

Unless otherwise provided for in the Plan, on the Effective Date, all promissory notes, instruments, indentures, agreements, or other documents evidencing, giving rise to, or governing any Claim against the Debtor shall represent only the right, if any, to participate in the Distributions contemplated by the Plan.

J.      **Other Plan Matters.**

1.      **Executory Contracts and Unexpired Leases.**

a.      **Assumption of Executory Contracts and Unexpired Leases.**

From and after the Effective Date, all Executory Contracts and Unexpired Leases that exist between the Debtor and any Person, which have not previously been assumed, assumed and assigned, rejected, will be deemed rejected pursuant to section 365 of the Bankruptcy Code. Entry

of the Confirmation Order shall constitute approval, pursuant to section 365(a) of the Bankruptcy Code, of the rejection of such Executory Contracts or Unexpired Leases rejected pursuant to the Plan.

### b. Claims for Rejection Damages.

Proofs of Claim for damages allegedly arising from the rejection of any Executory Contract pursuant to this Plan must be filed with the Bankruptcy Court and served on the Plan Administrator not later than thirty (30) days after the Effective Date. All Proofs of Claim for such damages not timely filed and properly served as prescribed herein shall be forever barred and the holder of such a Claim shall not be entitled to participate in any distribution under this Plan.

### c. Objections to Proofs of Claim Based On Rejection Damages.

Objections to any Proof of Claim based on the rejection of an Executory Contract pursuant to this Plan may be made as otherwise set forth in the Plan.

### 2. Conditions Precedent to the Effective Date.

The following are conditions precedent to the Effective Date of the Plan:

(a)    The Bankruptcy Court shall have entered the Confirmation Order and it shall not have been stayed, modified, or vacated on appeal.

(b)    The Confirmation Order shall provide for the releases, injunctions, and exculpation of the persons provided for by the Plan.

(c)    The Debtor or its designee shall have been appointed as Plan Administrator and shall have accepted to act in such capacity in accordance with the terms and conditions of the Plan.

(d)    All actions, documents, and agreements necessary to implement and consummate the Plan, including the Plan Administrator Agreement, if applicable, shall have been effected or executed and binding on all parties thereto.

(e)    All governmental and third-party approvals and consents, including Bankruptcy Court approval, necessary in connection with the transactions contemplated by the Plan shall have been obtained, not be subject to unfilled conditions, and be in full force and effect, and all applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain, prevent, or otherwise impose materially adverse conditions on such transactions.

### 3. Retention of Jurisdiction.

From and after the Effective Date, and notwithstanding the entry of the Confirmation Order, to the extent it has jurisdiction, the Bankruptcy Court shall retain and have original, but not exclusive, jurisdiction over the Bankruptcy Case and all matters arising under, arising out of, or related to the Bankruptcy Case, the Plan, and the Confirmation Order to the fullest extent permitted by law, including, among other things, jurisdiction to:

(a)     Insure that the Plan is consummated, and to enter an Order pursuant to Section 1142(b) of the Bankruptcy Code, to compel the Debtor and any other necessary party to take such action and execute such documents to effectuate the Plan;

(b)     Allow, disallow, determine, liquidate, classify or establish the priority, secured or unsecured status of any Claim, including, without limitation, the resolution of any request for payment of any Administrative Expense and the resolution of any and all objections to the allowance or priority of Claims;

(c)     Grant or deny any and all applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan, for any period ending on or before the Effective Date;

(d)     Resolve any motions pending on the Effective Date to assume, assume and assign, or reject any Executory Contract or Unexpired Lease to which the Debtor is a party or with respect to which the Debtor may be liable and to hear, determine and, if necessary, liquidate, any and all Claims arising therefrom;

(e)     Ensure that distributions to holders of Allowed Claims are accomplished pursuant to the provisions of this Plan;

(f)     Decide or otherwise resolve any and all applications, motions, adversary proceedings, contested or litigated matters, and any other matters or grant or deny any applications involving the Debtor that may be pending on the Effective Date;

(g)     Enter such Orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all contracts, instruments, releases and other agreements or documents created in connection with the Plan or Disclosure Statement or to enforce all orders, judgments, injunctions, and rulings entered in connection with the Case;

(h)     Resolve any and all controversies, suits or issues that may arise in connection with the consummation, interpretation or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

(i)     Modify the Plan before or after the Effective Date pursuant to Section 1127 of the Bankruptcy Code, and modify the Disclosure Statement or any contract, instrument, release or other agreement or document created in connection with the Plan or Disclosure Statement;

(j)     Cure any defect or omission or reconcile any inconsistency in any Order, the Plan, the Disclosure Statement or any contract, instrument, release or other agreement or document created in connection with the Plan, to the extent authorized herein or in the Bankruptcy Code;

(k)      Issue injunctions, enter and implement other Orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with consummation or enforcement of the Plan;

(l)      Enter and implement such Orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated;

(m)      Determine any dispute arising under or related to the Plan, including, without limitation, any dispute concerning the scope or effect of any release or discharge provided for by the Plan or the Confirmation Order;

(n)      Enter and implement such orders as are necessary or appropriate to implement or consummate the proposed sale of the Property.

(o)      Determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release or other agreement or document created in connection with the Plan or Disclosure Statement; and

(p)      Enter an Order or Final Decree concluding the Case.

### 4. Modification of the Plan.

The Debtor may modify the Plan at any time prior to the entry of the Confirmation Order provided that the Plan, as modified, and the Disclosure Statement pertaining thereto meet applicable Bankruptcy Code requirements, including those set forth in Section 1125.

After the entry of the Confirmation Order, the Plan Administrator may modify the Plan to remedy any defect or omission or to reconcile any inconsistencies in the Plan or in the Confirmation Order, as may be necessary to carry out the purposes and effects of the Plan, provided (i) the Plan Administrator obtains approval of the Bankruptcy Court for such modification, after notice and a hearing, and (ii) such modification shall not materially and adversely affect the interests, rights, or treatment, of any Class under the Plan.

### 5. Revocation or Withdrawal of the Plan.

The Debtor may revoke or withdraw the Plan at any time prior to entry of the Confirmation Order. If the Plan is revoked or withdrawn or if no Confirmation Order is entered, the Plan shall be null and void, and nothing contained in the Plan shall (i) constitute a waiver or release of any Claims by or against the Debtor; or (ii) prejudice in any manner the rights of the Debtor in any further proceedings involving the Debtor or its Estate.

## K.    Miscellaneous Provisions.

### 1.    Exemption from Transfer Taxes.

All transfers of Assets made pursuant to the terms of the Plan shall be exempt from all stamp, transfer, and similar taxes within the meaning of section 1146(c) of the Bankruptcy Code, to the fullest extent permitted by law.

### 2.    Closing of the Bankruptcy Case.

Upon the Substantial Consummation of the Plan, the Debtor shall expeditiously move for the entry of a Final Decree closing the Case and such other relief as may be just and appropriate.

### 3.    No Admissions.

Notwithstanding anything herein to the contrary, nothing contained herein or in the Plan shall be deemed an admission by the Debtor with respect to any matter set forth in the Plan including, without limitation, liability on any Claim or the propriety of any classification of any Claim.

### 4.    Controlling Documents.

If there is an inconsistency or ambiguity between any term or provision contained in this Disclosure Statement and the Plan, the terms and provisions of the Plan shall control.  To the extent there is an inconsistency or ambiguity between any term or provision contained in the Plan and the Confirmation Order, the terms and provisions of the Confirmation Order shall control.

### 5.    Governing Law.

Except to the extent the Bankruptcy Code, the Bankruptcy Rules, or other federal or state laws are applicable, the laws of the State of New York shall govern the construction, implementation, and enforcement of the Plan and all rights and obligations arising under the Plan, without giving effect to the principles of conflicts of law.

### 6.    Successors and Assigns.

The rights, benefits and obligations of any Person named or referred to in the Plan will be binding upon, and will inure to the benefit of, the heir, executor, administrator, representative, successor, or assign of such Person.

### 7.    Severability.

Should the Bankruptcy Court determine, on or prior to the Confirmation Date, that any provision of the Plan is either illegal or unenforceable on its face or illegal or unenforceable as applied to any Claim, the Bankruptcy Court may alter and modify such provision to make it valid and enforceable to the maximum extent practicable consistent with the original purpose of such provision. Notwithstanding any such determination, interpretation, or alteration, the remainder of the terms and provisions of the Plan shall remain in full force and effect.

**8.      Integration.**

All exhibits are incorporated in and is a part of the Plan as if set forth in full therein.

**9.      Binding Effect.**

The Plan is binding on and inures to the benefit of (and detriment to, as the case may be) the Debtor and all holders of Claims (whether or not they have accepted this Plan) and their respective personal representatives, successors, and assigns.

**10.      Other Documents and Actions.**

Subject to the provisions of the Plan, the Plan Administrator may execute, deliver, file, or record such documents, contracts, instruments, releases and other agreements, and take such other action as is reasonable, necessary, or appropriate to effectuate the transactions provided for in the Plan, without any further action by or approval of the Bankruptcy Court.

## ARTICLE V. FINANCIAL INFORMATION

The Debtor has filed Schedules and monthly operating reports with the Bankruptcy Court. This financial information may be examined in the Bankruptcy Court Clerk's Office.

## ARTICLE VI.      ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

The Debtor believes that confirmation of the Plan represents the best mechanism for resolving the Claims against the Debtor and otherwise expediting a prompt distribution to holders of Claims. The Debtor believes that the alternatives to confirmation of the Plan include (a) development of an alternative plan, (b) dismissal of the Bankruptcy Case, or (c) conversion of the Bankruptcy Case to a case under chapter 7 of the Bankruptcy Code and liquidation of its assets under Chapter 7. The Debtor believes that each of these alternatives is inferior to confirmation of the Plan.

The Plan will allocate estate assets in compliance with the EPA/DOL Settlement Agreement. The Debtor estimates that approximately $300,000 will be available to fund distributions to General Unsecured Claims and Tort Claims.

Dismissal of the bankruptcy case is also an inferior alternative. The Debtor commenced this bankruptcy case specifically to propose and effectuate a Plan. A federal forum, which bankruptcy relief provides, is, in the Debtor's view, the best mechanism to distribute the Debtor's assets and resolve issues with the Debtor's creditors. The Debtor does not believe there is comparable relief available in an alternative state forum and believes that it is impractical and inequitable to allow creditors to "race to the courthouse" in an attempt to obtain what is remaining of the Debtor's assets. Therefore, dismissal of the bankruptcy case is not an appropriate alternative to the Plan.

A liquidation analysis attempting to demonstrate the funds available for distribution if the case were converted to a liquidation proceeding under Chapter 7 is annexed hereto as Exhibit "C". The Debtor has successfully liquidated substantially all of its Assets; however, a Chapter 7 Trustee would not be the optimal party to address Tort Claims which absent a determination and liquidation of the amount of those claims would overwhelm any distribution to the balance of General Unsecured Claimants. The Plan provides a mechanism and timetable for Tort Claimants to be determined, liquidated and receive a recovery from the Tort Claims Reserve. Moreover, in the event of a conversion to Chapter 7, the EPA and DOL's administrative claims may consume all of the assets of the estate resulting in no distribution to unsecured creditors.

## ARTICLE VII.    CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The confirmation and execution of the Plan may have tax consequences to holders of Claims. The Plan Proponents do not offer an opinion as to any federal, state, local, or other tax consequences to holders of Claims and Interests as a result of the confirmation of the Plan. All holders of Claims are urged to consult their own tax advisors with respect to the federal, state, local and foreign tax consequences of the Plan. This Disclosure Statement is not intended, and should not be construed, as legal or tax advice to any Creditor, Interest holder, or other party in interest.

## ARTICLE VIII.    CONCLUSION AND RECOMMENDATION

The Debtor believes that confirmation of the Plan is in the best interests of all holders of Claims and urges all holders of Class 2 and 3 Claims to vote to accept the Plan and to evidence such acceptance by returning their Ballots so that they will actually be received on or before 4:00 p.m., prevailing Eastern Time, on [_____]

Dated:  November 15, 2024
      Buffalo, New York

HODGSON RUSS LLP
*Counsel to Tonawanda Coke Corporation*

    */s/ James C. Thoman*
    James C. Thoman, Esq.
    The Guaranty Building
140 Pearl Street, Suite 100
Buffalo, New York  14202
Telephone:  (716) 856-4000
Facsimile:  (716) 849-0349
Email:  jthoman@hodgsonruss.com


    /s/ Michael Durkin
TONAWANDA COKE CORPORATION
By:    Michael Durkin
Title:  President

46471281v14